UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| EVONNE THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:13-CV-289-JD |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

In 2010, claimant Evonne Thomas applied for but was denied social security disability benefits by the Social Security Administration.[1] She then filed a complaint in this Court, seeking review of that decision, and the matter has been fully briefed [DE's 18, 24, 29]. For the following reasons, the Court REMANDS this matter to the Commissioner for further proceedings.

**I. BACKGROUND**

On November 5, 2010, claimant Evonne Thomas applied for Social Security Disability Insurance Benefits ("DIB"), and on January 29, 2010, she applied for Supplemental Security Income ("SSI),[2] alleging a disability onset date of October 9, 2009. (R. 204; 211). Her claims were denied upon initial consideration on April 26, 2011, and upon reconsideration on July 7,

---

[1] Thomas has twice had prior applications denied as well.

[2] The regulations governing the determination of disability for Disability Insurance Benefits are found at 20 C.F.R. § 401.1501 *et. seq.*, while the Social Security Income regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

1

2011. (R. 108-111). On August 9, 2011, she filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 146).

The hearing was held on May 11, 2012 (R. 36). Thomas appeared with counsel and testified on her own behalf before ALJ Steven Neary. (R. 36–56). Vocational Expert ("VE") Amy Kutschbach also appeared and testified at the hearing. (R. 36; 56–59). ALJ Neary issued his decision on June 22, 2012, denying Thomas benefits and finding that she is not disabled within the meaning of the Social Security Act. (R. 21-31). Thomas requested review of the denial on August 16, 2012. (R. 12–17). The Appeals Council denied Thomas' request for review on August 10, 2013, thereby rendering ALJ Neary's decision the final action of the Commissioner. (R. 1–5). Thomas then filed her complaint, and this Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

Thomas alleges that she suffers from mental and physical impairments (mainly asthma and bronchitis); however, she only seeks review on the basis of her mental impairments which limit her ability to maintain concentration, persistence, and pace. In short, Thomas contends that the ALJ failed to account for this aspect of her mental limitations in the Residual Functional Capacity ("RFC")[3] assessment and in the hypothetical questions posed to the VE, thereby requiring a remand.

## II. FACTS

Thomas was born on April 5, 1961. (R. 196). She was 48 years old at the time of her alleged onset date and 51 years old at the time of the ALJ's decision. (R. 39). She has a high school education (R. 322); and, she has performed past work as a telephone directory deliverer, order clerk, telephone solicitor, and nurse's aide. (R. 291).

---

[3] Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545.

**A. Mental Health History**

For the purpose of this appeal, Thomas' relevant medical history indicates that on May 14, 2009, she saw Tara Pelz for an Insight Diagnostic Evaluation at Park Center. (R. 311-319). Pelz found that Thomas "presented with racing thoughts, mood fluctuations, troubling sleep, overeating, and a lack of concentration," and also had a history of cocaine dependence. In her interview with Pelz, Thomas chronicled her past. Pelz's assessment then noted Thomas' "problems with recent . . . [and] immediate memory," as well as Thomas' inability to stay on task. (R. 314). In addition, Pelz noted that Thomas had trouble shifting focus from one activity to another and had "difficulties with sitting still, paying attention, or doing things without thinking." (R. 314). Pelz also found that Thomas had poor judgment, minimal insight, depression, anxiety, and anger. (R. 314). Ultimately, Pelz diagnosed Thomas with bipolar disorder NOS and cocaine dependence in partial remission. (R. 317). Pelz assigned Thomas a Global Assessment of Functioning ("GAF") score of 51,[4] indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. (R. 317). Thomas was referred to therapist Michele Jones and psychiatric nurse practitioner Karen Lothamer.

In July 2009, Michele Jones noted that Thomas was attending group therapy to help with mood regulation and she was scheduled for an evaluation with Karen Lothamer. (R. 359). Lothamer's evaluation was performed on August 4, 2009, at which time Thomas presented with depression, difficulty sleeping, lack of concentration, fatigue, loss of appetite, and anxiety. (R. 340-345). Lothamer noted that Thomas had a history of paranoia, hallucinations, and flashbacks.

---

[4] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Thomas' assessment, GAF scores were still in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited March 10, 2015). A score of 51-60 indicates that Thomas was experiencing "moderate symptoms."

Specifically, Thomas indicated to Lothamer that she had been hearing "spiritual voices telling her to do right and wrong things." (R. 340). Lothamer also noted that Thomas presented with memory impairment and symptoms of inattention. (R. 340). On the mental status exam, Lothamer found that Thomas demonstrated poor judgment, minimal insight, depression, anxiety, anger, and problems with recent and immediate memory. (R. 342). Lothamer's diagnostic impression was bipolar disorder and cocaine dependence. (R. 344). Thomas' GAF score was 51 and the treatment plan indicated that Thomas was to start taking Geodon and return in one month. (R. 344).

On October 8, 2009, Michele Jones indicated that Thomas was having some problems with mood stabilization and was very manic. (R. 362). However, Thomas was not taking the Geodon as prescribed, but she was attending group therapy. (R. 362). The record reflects that Thomas then terminated her treatment with Park Center on December 21, 2009. (R. 350). Jones noted that Thomas had appeared to show some benefit with group therapy, but Thomas indicated that she would be receiving treatment at the Bowen Center. (R. 350).

On March 2010, Thomas underwent a psychiatric evaluation at the Bowen Center which was conducted by Dr. Mahender Surakanti, M.D. (R. 438–442). Psychiatrist Surakanti diagnosed Thomas with bipolar disorder and a history of cocaine dependence, alcohol dependence, and marijuana use. (R. 441). He recorded a GAF score of 60-65 and acknowledged Thomas' "[o]ngoing mood symptoms, history of substance abuse problems, and poor support system." (R. 441). Dr. Surakanti also noted that Thomas was no longer taking Geodon and had no insurance to get medication. (R. 438). In response to Thomas' financial situation and her report of mood swings, Dr. Surakanti started her on lithium carbonate as a treatment plan. (R. 442). Thomas met with Dr. Surakanti several times after this. (R. 305-306, 454-460).

Thomas underwent another Insight Diagnostic Evaluation at Park Center on December 6, 2010, this time performed by Brent Stachler. (R. 320–27). Now Thomas was suffering from pathological gambling, as well as bipolar disorder, cocaine dependence, and anxiety disorder NOS. Thomas' GAF score was 45, indicating serious symptoms or serious impairment. (R. 326). Thereafter, Stachler's February 2011 progress note indicated that Thomas was minimally engaged with her gambling addiction therapy program and was showing poor progress. (R. 366). Thomas reported that her schooling was interfering with her scheduled group time and that she no longer wanted to attend group therapy. (R. 366).

On April 18, 2011, Michael Scherbinski, a licensed clinical psychologist, performed a Mental Status Examination on Thomas. (R. 374–380). Scherbinski noted that Thomas expressed increased severity of her bipolar disorder since her son's death in January 2011. (R. 374). She reported no longer participating in counseling or mental health therapy, and she was experiencing suicidal ideation and engaging in self-injurious behavior by taking an overdose of pills. (R. 375). Thomas also reported experiencing both auditory (i.e. voices) and visual (i.e. shadows) hallucinations twice per week. (R. 375). She reported spending the morning in bed and semi-regular bathing, cooking, and shopping. (R. 375). Scherbinski observed that Thomas had appropriate social interactions, although her affect was "somewhat depressed as evidenced by occasional tearfulness and despondency." (R. 376). Scherbinski documented her short-term memory as being somewhat below average and her intellectual functioning as being variable, although he indicated that she was able to maintain focus and concentration during the examination. (R. 377-378). Scherbinski reported that she would potentially be able to gain and/or maintain employment but would benefit from ongoing medication management and mental

health therapy. (R. 377). His diagnosis was bipolar disorder NOS and polysubstance dependence, in sustained full remission. Scherbinski rated her GAF score as 57. (R. 378).

On April 25, 2011, Benetta Johnson, PhD., completed a Psychiatric Review Technique, finding that although Thomas suffered from bipolar disorder and substance addiction disorder, Thomas' impairments were not severe. (R. 381–393). Johnson indicated that Thomas suffered from only mild limitations with respect to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that she suffered from no episodes of decompensation of an extended duration. In June 2011, Johnson's report was reviewed and approved by Randall Norton, Psy.D. (R. 395).

In August 2011, Thomas was voluntarily admitted for three days at Parkview Behavioral Health with a diagnosis of major depression. (R. 403). Thomas reported feeling depressed and having thoughts about hurting others. (R. 403). Dr. Surakanti indicated that she had poor grooming, borderline hygiene, and severe depression. He detailed her affect as "sad and constricted," noting that there was ongoing homicidal ideation during her stay. (R. 404). Thomas was started on lithium carbonate, celexa, and trazadone, and she showed good improvement. She was given a prescription and scheduled for a follow-up appointment at the Bowen Center. (R. 404). Upon her discharge, she had a reported GAF score of 45 to 50. (R. 403).

The following month, Thomas underwent evaluation at the Bowen Center by Klinton Krouse. (R. 409–416). Krouse's diagnostic impression was that Thomas, in addition to having been previously diagnosed with bipolar disorder, alcohol dependence, and cannabis abuse, showed features of suffering from post-traumatic stress disorder and psychosis. (R. 410). Krouse indicated that Thomas could benefit from "medication education" so that she can understand the need to be compliant with her medications; and, if she could "find some internal motivation to

6

take her medication as prescribed, follow up with physicians and learn better skills to cope with her mental problems, then her prognosis would improve." (R. 410). Krouse scheduled Thomas for individual therapy with Connie Anderson, a social worker at the Bowen Center. (R. 410).

By October, Anderson noted Thomas' overall improvement as stable. (R. 464). The primary objective of Thomas' sessions was to address coping mechanisms and to work on processing her emotions related to the death of her son. (R. 464). On January 10, 2012, Thomas called the Bowen Center and asked to be placed on a lower dose of lithium because her increased dosage was too expensive. (R. 448). On February 17, 2012, Anderson recorded that Thomas was slightly improved overall, but Thomas had reported increased stress and agitation. (R. 463). It was noted that Thomas needed continued emotional support to maintain her current level of functioning and to develop coping skills. Later that month it was reported that, even though Thomas' medication was effective, she was experiencing side effects, including increased lethargy. (R. 446). In April, Thomas reported the additional side effect of weight loss. (R. 443–444).

### B. Administrative Hearing and ALJ Decision

#### 1. *Thomas' Testimony*

At the administrative hearing, Thomas testified that she lived alone. (R. 39). She stated that she had not worked since 2009 and was unable to work because her "concentration is gone" and she "can't stay on task." (R. 41). She indicated that her current medications included celexa, trazodone, and lithium, but she testified that she "couldn't tell" if the medications helped, and she experienced "moments of not being able to remember stuff." (R. 42). Thomas believed that her mental state would affect her ability to work because she had difficulty understanding things, staying focused, and had been fired for poor performance in the past. (R. 44).

On a typical day, Thomas testified that she spent most of the day sleeping; she only bathed semi-regularly due to her depression and she did most of her own housework and cooking. (R. 48-50). Thomas noted that she sometimes needed help from others because she had trouble concentrating, resulting in burned meals. Thomas also testified that she liked to play cards and Scrabble, as well as sing, but that she had difficulty focusing.

While Thomas had been sober for two years (R. 48–49), she testified that she had been having auditory hallucinations "for a while now" and that it had gotten worse since the death of her son, occurring probably twice a week. (R. 51-56). Thomas noted that she had feelings of paranoia "once or twice a week" and that she slept with a knife. Because Thomas slept poorly, she was often tired during the day. Thomas indicated that she was anxious being around strangers, and she had difficulty getting along with others, which caused her problems in the past with coworkers and bosses. Thomas believed that her problems became worse since the death of her son. She also testified that at the time of the hearing she was getting treatment at the Bowen Center and was complying with the treatment plan, meeting with her counselor, and taking her prescribed medications.

    2. *VE's Testimony*

Prior to testifying, the VE confirmed that she had reviewed Thomas' past employment records. (R. 57). The ALJ then asked the VE two hypothetical questions. First, the ALJ posited a hypothetical individual of Thomas' age, education, and past work experiences, but limited work to occupations which did not require working with the public, or the performance of complex or detailed tasks, and only involved performing simple, routine tasks consistent with unskilled work. (R. 57). The VE responded that "with those limitations" such an individual could not perform Thomas' past work but could perform work as an automobile detailer, floor waxer, and

8

laundry worker. (R. 58). The ALJ then asked the VE to assume a person of Thomas' age, education, and past work experience who suffered from the "limitations consistent with Ms. Thomas' testimony." The VE responded that such an individual would be unable to perform Thomas' past employment or any other jobs. (R. 58–59).

     *3. ALJ's Decision*

The ALJ found that Thomas met the insured status requirements of the Social Security Act through March 31, 2012. (R. 23). In addition, the ALJ found that Thomas had not engaged in substantial gainful activity since October 9, 2009, the alleged onset date. (R. 23). The ALJ concluded that Thomas suffered from the severe impairments of bipolar disorder, depression, and a history of polysubstance abuse. (R. 24).

Despite these impairments, the ALJ concluded that Thomas did not have an impairment or combination of impairments that met or medically equaled any of those included in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24). In doing so, the ALJ determined that Thomas suffered from mild restrictions with performing activities of daily living and moderate difficulties with social functioning and maintaining concentration, persistence, or pace. (R. 25).

The ALJ found that Thomas' allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible in relevant part because the evidence showed that her condition improved with medication, and she had at times been non-compliant with her medication and treatment. (R. 28). The ALJ said nothing about Thomas' financial circumstances or availability of insurance.

In determining Thomas' RFC, the ALJ concluded that Thomas had the RFC to perform a full range of work at all exertional levels with nonexertional limitations, including no working

9

with the public or performing complex or detailed tasks, but the work could involve the performance of simple, routine tasks consistent with unskilled work. (R. 26). The ALJ did not impose any pace-related restrictions or explain his reasons for the omission.

Given the RFC finding, the ALJ concluded that Thomas could not perform any of her past relevant work, but she could perform jobs that existed in significant numbers in the national economy (namely, a floor waxer, a laundry worker, and an automobile detailer), and that Thomas was, therefore, not disabled. (R. 30 –31).

### III. STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399-400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform relevant past work; and
5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)–(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a Listing is not met or equaled in between steps three and four, the ALJ must assess the claimant's RFC, which is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Thomas argues that the ALJ erred by not fully accounting for her concentration, persistence, and pace limitations in the RFC and in the hypotheticals posed to the VE. For the reasons discussed below, this failing (among the various others noted) warrant remand.

### A. The RFC—Thomas' Concentration, Persistence, and Pace

The RFC measures an individual's capabilities in light of the limitations imposed by her impairments. *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96–8p. The RFC must account for all of a claimant's physical and mental limitations, regardless of whether the ALJ found those limitations to be severe or marked at an earlier stage of the analysis. *Villano v.*

*Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a); SSR 96–8p. In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, "even [limitations] that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (quoting *Villano*, 556 F.3d at 563).

At steps 2 and 3 of the analysis, ALJ Neary determined that Thomas suffered from severe mental impairments which resulted in moderate difficulties with regard to concentration, persistence, or pace. (R. 24-25). The ALJ made these findings after discounting the reviewing state agents' opinions indicating that Thomas did not suffer from a severe mental impairment and had only mild limitations with respect to maintaining concentration, persistence, or pace. ALJ Neary then proceeded to determining Thomas' RFC, and in doing so, limited Thomas to unskilled work, but did not impose any pace-related restrictions.

The government defends the ALJ's RFC finding based on the flawed proposition that had the ALJ simply adopted the state agency opinions, then Thomas would not even be able to raise the argument that the ALJ failed to account for her pace-related limitations. The government also believes that even after discounting the state agents' opinions, the ALJ cannot be penalized for exceeding the set of limitations counseled by the state agents.

But the government's argument wholly fails to acknowledge that regardless of the opinions rendered by state agents, the ALJ's decision must be supported by substantial evidence, *Craft*, 539 F.3d at 673, and ultimately, an ALJ is not bound by the findings of the state agency. 20 C.F.R. § 404.1527(e)(2)(i) (while an ALJ must consider findings of state agency medical and psychological consultants, an ALJ is "not bound" by those findings); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) ("The ALJ certainly is entitled to give non-examining [state agency]

psychiatrist Dr. Tomassetti's opinion whatever weight that it is due"). Therefore, once ALJ Neary determined that Thomas suffered from certain limitations on account of her mental issues (in spite of what the state agents opined), he was then required to explain how those limitations were accounted for in the RFC determination.

With that said, in discussing Thomas' RFC, the ALJ made the explicit assertion—one which the government seemingly overlooks—that Thomas' "moderate difficulties with *concentration and focus* have been addressed with a limitation of only performing occupations which do not require the performance of complex or detailed tasks." (Tr. 29) (emphasis added). In drawing this conclusion, however, the ALJ did not adequately explain how merely limiting Thomas to simple, routine, and unskilled work actually accounted for Thomas' believed problems with sustaining concentration and focus.

The Seventh Circuit has previously indicated that limiting a claimant to simple, routine, and repetitive work does not necessarily address the claimant's deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009). And therefore, an ALJ must specifically account for a claimant's ability to stick with a task (even if limited to unskilled work) over a sustained period. *See Warren v. Colvin*, 565 F. App'x 540 (7th Cir. 2014); *see also* SSR 85-15 ("[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job."). Here, the ALJ committed error by not explaining what evidence supported his belief that Thomas was able to complete tasks (*even if* repetitive and

14

simple), over a sustained period of time at a competitive pace.[5] For this reason, remand is required.

On remand, the ALJ must also account for his inconsistent finding that Thomas suffered from "moderate difficulties in social functioning" which, according to the ALJ, were accounted for in the RFC by merely limiting Thomas to jobs that did not require working with the public. However, the ALJ said nothing about why Thomas doesn't also require limited contact with co-workers and supervisors. Such an explanation is necessary since the evidence, as even relied on by the ALJ, revealed that Thomas has had trouble getting along with others and has even been fired for arguing with her bosses. These additional social limitations, if included in the RFC, most certainly would have substantially reduced the number of jobs available to the claimant. *See* SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to . . . respond appropriately to supervision, coworkers, and usual work situations . . . A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base."). Accordingly, on remand the ALJ is expected to discuss whether Thomas requires work restrictions that limit her contact with co-workers and supervisors given her difficulties in social functioning.

Additionally, the Court cannot overlook an escapable misstatement of law made by the ALJ with respect to the RFC finding that ought not to be repeated on remand. Although Thomas has not asserted that she suffers from additional limitations on account of her physical ailments, the ALJ indicated that no exertional limitations were included in the RFC finding because "the

---

[5] And despite the government's contention to the contrary, Thomas' lack of concentration and inability to stay on task and maintain focus is certainly well documented.

claimant does not have a severe physical impairment."[6] (Tr. 29). But as previously discussed, *all* limitations, even those that are non-severe must be included in the RFC assessment. *Villano*, 556 F.3d at 563; *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a); SSR 96–8p. In other words, just because an impairment is not designated as being "severe" for purposes of step 2, doesn't mean that the medical impairment cannot limit an individual's ability to do basic work activities. *Id*. Thus, should it be determined that Thomas' physical ailments, including her asthma and bronchitis, require additional work-related limitations, such as the need to avoid certain environmental exposures, then the ALJ must include a discussion of any such limitations which are deemed credible and explain how they are then accounted for in the RFC.

On remand, the ALJ must analyze the claimant's mental and physical impairments in combination, including those that are non-severe, and sufficiently explain his analysis of the evidence supporting his ultimate RFC determination. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

**B. Hypothetical Questions Posed to the VE**

Thomas argues that the ALJ also erred by not fully accounting for her moderate limitations in concentration, persistence, and pace in the hypotheticals the ALJ posed to the VE. The government counters that just because the ALJ found such limitations existed at step 2 and 3, the ALJ is not then required to include those findings in the RFC or the hypothetical questions.

The government's argument disregards the fact that ALJ Neary explicitly noted *in his RFC analysis* that Thomas suffered from moderate difficulties with concentration and focus. (R. 29). Having expressly found that these limitations existed during his RFC analysis, ALJ Neary was then required to account for these limitations not only in the RFC finding (as previously

---

[6] The government actually endorsed this statement (DE 24 at 13) and a similar statement made by the ALJ with respect to Thomas' mental limitations (DE 24 at p. 5-6, n. 1).

16

discussed), but the limitations also needed to be included in the hypotheticals that he posed to the VE. *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014) ("As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record . . . [t]his includes any deficiencies the claimant may have in concentration, persistence, or pace.") (citations and internal citations omitted); *Stewart*, 561 F.3d at 694 ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record . . . More specifically, the question must account for documented limitations of 'concentration, persistence or pace.'") (citations and internal citations omitted); *see also Warren*, 565 F. App'x at 544 (noting that when a claimant has limitations in his ability to concentrate, persist, and maintain pace, "[t]he hypothetical must account for both the complexity of the tasks and the claimant's ability to stick with a task over a sustained period.").

Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner*, 627 F.3d at 619, n. 5 (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). No such exception applies here. First, the VE never indicated having reviewed Thomas' medical records. Second, with respect to the first hypothetical (upon which the ALJ's RFC finding was ultimately based), the VE explicitly indicated that her response was premised on the specific limitations set forth by the

17

ALJ in the hypothetical, which did not mention Thomas' difficulties with concentrating and focusing. *See id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003). Further, when the VE was allowed to consider the limitations to which Thomas testified, the VE explicitly acknowledged that Thomas would not be able to perform any work based on her testimony.

So not only did the ALJ's RFC finding fail to include Thomas' difficulties with concentrating and focusing (and the other limitations previously identified), but the ALJ also failed "to orient the VE to the totality of a claimant's limitations" as required. *O'Connor-Spinner*, 627 F.3d at 618. These errors warrant a remand. Once the ALJ provides adequate support for his RFC findings, which can then be used as the basis of the hypotheticals, the Court can assess whether a VE's testimony can be relied upon as an accurate indicator for the type of work Thomas is capable of performing.

### C. Credibility and Substance Use

Two final issues are worth mentioning for purposes of remand. First, should the ALJ again discount Thomas' claimed limitations on account of her non-compliance with medication and treatment, then the ALJ must consider Thomas' reasons for being non-compliant, especially given that the record evidence suggests she may lack the funds necessary to obtain needed treatment and her mental illness may have contributed to her non-compliance. *See e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citations omitted); SSR 96–7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical

treatment."). Second, given the existence of medical evidence supporting Thomas' potentially having an ongoing substance addiction,[7] should the ALJ find that Thomas is disabled, then the ALJ may need to explain whether Thomas' drug addiction is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Thomas' request to remand the ALJ's decision [DE 1]. This case is **REMANDED** for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED: March 13, 2015

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[7] The ALJ found that Thomas suffered from a history of polysubstance abuse and noted that "the diagnosis of cannabis abuse seems to indicate active substance use while cocaine dependence has been an ongoing diagnosis during much of the relevant period." (R. 24, 29).

19